

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA

2001 APR 20  PM 3: 37

LORETTA G. WHYTE
CLERK

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

**GARRETT NAQUIN**                                    **CIVIL ACTION**

**VERSUS**

**NOKIA MOBILE PHONES, INC.,**                **NO. 00-2023**
**WESTINGHOUSE CORPORATION,**
**NEC AMERICA, INC., ERICSSON INC.,**
**MOTOROLA CORPORATION,**
**SPRINT CORPORATION,**                          **SECTION "B"**
**AUDIOVOX CORPORATION,**
**LGIC CORPORATION,**
**NEXTEL COMMUNICATIONS, INC.,**
**PANASONIC CORPORATION,**                   **MAGISTRATE 4**
**PHILIPS CORPORATION, QUALCOMM**
**CORPORATION,**
**SAMSUNG SDI CO., LTD. AND SAMSUNG**
**ELECTRONICS, SANYO CORPORATION,**
**SONY CORPORATION, AT&T CORPORATION,**
**CELLULAR RENTALS, INC., PLANET CELLULAR**
**COMMUNICATIONS, INC., VISITOR CELLULAR L.L.C.,**
**BELL SOUTH MOBILITY AND RADIOFONE**

    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## FIRST SUPPLEMENTAL AND AMENDING
## CLASS ACTION COMPLAINT



Fee_____
Process_____
X  Dktd_____
___CtRmDep_____
Doc.No._106

NOW INTO COURT, through counsel, comes plaintiff, who files this First Supplemental and Amending Class Action Complaint by which is added class representative named defendants and factual allegations and by which are added and deleted cause of action, all as set forth herein.

I.

All of the original allegations of the original petition filed in the Civil District Court for the Parish of Orleans, State of Louisiana, thereafter removed to this Court in this proceeding are restated and re-incorporated in their entirety unless and only to the extent they are specifically amended and/or supplemented by any of the allegations stated herein. All new paragraphs will be identified by Roman numerals.

II.

Paragraph 1 is supplemented to add the following parties:

**Plaintiffs**

    a)    Judith A. Kaufman is a person of the full age of majority and a citizen and resident of this state and this district.

    b)    Asher Rubinstein is a person of the full age of majority and a citizen and resident of this state and this district.

**Defendants**

    a)    Philips Electronic North America Corporation (PENAC) is a Delaware corporation with its principal place of business in New York, but having a business establishment

2

in Louisiana at 8550 United Plaza Blvd. with CT Corporation System at 8550 United Plaza Boulevard, Baton Rouge, Louisiana, as its agent for service of process.

b)    By substituting "Motorola Inc." in the place and stead of Motorola Corp.

c)    Audiovox Communications Corporation is a corporation incorporated in a state other than Louisiana with its principal place of business in a state other than Louisiana, but having a Louisiana office at 707 Rapides Street, Baton Rouge, and USC of Louisiana Inc. at 3867 Plaza Tower Drive, lst Floor, Baton Rouge, Louisiana as its agent for service of process.

d)    Sanyo Business Systems Corporation is a foreign corporation with its address at 1006 Hibernia Bank Building, New Orleans, Louisiana 70112 with its agent for service of process at Prentiss-Hall Corp. System, Inc., 203 Carondelet Street, New Orleans, LA 70130.

e)    Nokia Corporation is a corporation incorporated in a state other than Louisiana with its principal place of business at 1290 Avenue of the Americas, New York, New York, 10104.

f)    Nokia, Inc. is a corporation incorporated outside of Louisiana with its principle place of business outside of the State of Louisiana.

g)    Cingular Wireless, LLC, formerly BellSouth Mobility, Inc., is a corporation with its principal place of business in Delaware, but having a business establishment in

3

Louisiana at 320 Somerulos Street, Baton Rouge, LA 70802-6129 with its agent for

service of process at Corporation Service Company, 320 Somerulos Street, Baton

Rouge, LA 70802-6129.

h)    Sprint Spectrum LLP, d/b/a Sprint PCR is a corporation with its principal place of

business in Delaware, but having a business establishment in Louisiana at 203

Carondelet Street, Suite 811, New Orleans, LA 70130-3017 with its agent for service

of process at The Prentice-Hall Corporation System, Inc., 701 South Peters Street,

Second Floor, New Orleans, LA 70130.

i)    Kyocera Wireless Corporation as successor in interest to Qualcomm, is a foreign

corporation with its principal place of business in California, but having a business

establishment in Louisiana at 320 Somerulos Street, Baton Rouge, LA 70802-6129

with its agent for service of process at Corporation Service Company, 320 Somerulos

Street, Baton Rouge, LA 7802-6129.

## INTRODUCTORY ALLEGATIONS

III.

This is a civil action filed as a class action arising out of the manufacture and sale of cellular

wireless hand held telephones (hereinafter referred to "WHHPs") which WHHPs failed to include

as a standard component thereof headsets, ie. the device or mechanism necessary to protect the users

from radio frequency radiation (RFR) emitted from WHHPs' antennas placed in close proximity to

4

the user's head. The WHHPs at issue herein are not to be confused with cellular telephones and other communication devices permanently mounted in automobiles, trucks, and other public and/or private vehicles. These are wireless cellular telephones currently in widespread use in the United States and the world which are held up to the user's ear and against the user's head, thereby exposing individuals to unwanted RFR and in the absence of headsets, which are not a standard component of WHHPs, fail to protect users from and exposure to RFR which creates health risks and adverse effects by causing nerve damage, cellular damage, cellular dysfunction and/or other injury to humans.

IV.

By amending the original Petition so as to substitute the words "wireless hand held portable telephones" (WHHPs) in the place and stead of the words "cell phones" wherever the words "cell phones" and/or "cellular phones" were used in the original Petition.

V.

Scientific and medical research, published in peer reviewed literature, has demonstrated adverse cellular reaction and cellular dysfunction from exposure to RFR from cell phone frequencies and other frequencies within radio frequency band of 300 megahertz to 2.4 gigahertz.

VI.

The adverse effects are broken down into the following areas:

    a)    calcium and ion distributions;

5

b) melatonin production;

c) neurological effects;

d) DNA single and double strand breaks and chromosome damage;

e) enzyme activities;

f) cell stress and gene transcription; and

g) interference with function of the blood brain barrier.

VII.

The Chemical Link:  Calcium and Ion Distribution across the Membrane

The universal chemical link between EMFs and life processes is believed by many scientists to be ions, especially calcium ions. External EMF s clearly affect the electrical properties and ion distribution around cells. Virtually all physiological processes in our body involve ions.

VIII.

One of the most experienced researchers in the field, Dr. Ross Adey, in 1988 presented a three step model involving calcium ions which could explain observed EMF induced biological effects. Key to the model is the activation of intracellular messenger systems (adenylate across and protein kinase) by calcium in a stimulus amplification process across the cell membrane.

IX.

Numerous scientific studies have demonstrated the physiological importance of calcium. Calcium functions as an ubiquitous intracellular messenger. For example, in 1947 it was shown that

6

an intracellular injection of a small amount of calcium causes a skeletal muscle to contract. In recent

years it has become clear that calcium acts as an intracellular messenger in a wide variety of cellular

responses, including secretion and cell proliferation. In nerve cells, calcium influx had been shown

to be involved in the initiation of neurotransmitter secretion; the calcium enters the cells through

voltage-gated ion channels that open when the plasma membrane of the nerve terminal is depolarized

by an invading action potential. Another function of calcium in all cells is to regulate metabolic

processes in conjunction with the calcium-binding protein calmodulin. Many enzymatic processes

are regulated by calcium. Calcium has been shown to modify gene transcription.

## X.

Thus, induced alteration of intracellular calcium concentrations which disrupts the

homeostasis of the cell, has serious consequences for the health and future development of the cell.

Calcium ions in partnerships with biomolecules have been shown to control the proliferation of non

turmorigenic cells in vitro and in vivo.  The evidence points to calcium and a biomolecule called

AMP being co-generators of the signal committing the cell to DNA syntheses.  Calcium influx in

a cell stimulates proliferation, whereas calcium efflux does the opposite.

## XI.

Balcer-Kubiczel (1994) linked intracellular calcium levels to the future of damaged cells

between becoming transformed (cancer) or dying by apoptosis (the health situation).  Mattana et al.

(1977) described the importance of calcium ions for cell homeostasis which controls a variety of

7

cellular responses determining the health of the cell. Hence, reductions in intracellular calcium have a very important effect.

### XII.

Calcium ions are involved in the function of gap junctions or protein structures which link adjacent cells and provide a channel for the passing of messenger molecules. The gap junction can open and close to control the flow. The opening and closing is regulated by calcium ion concentration. Thus, calcium plays another key role in maintaining or interrupting the communication mechanisms for maintaining the health of cells because gap junctions are used to sense differences between cells and to initiate corrections in regulatory behavior as necessary.

### XIII.

It is widely accepted that calcium plays a central role in the development of the immune system response. An elevation of calcium ions is a nearly universal feature associated with activation of cells of the immune system. Using T-cell human leukemia cells, Lindstrom et al. (1995) replicated and extended the research of other scientists and showed, that oscillating low level EMPs produce the same calcium ion reaction as does an, antibody.

### XIV.

Numerous scientific studies have demonstrated that EMFs can alter the membrane ion pumps responsible for pumping calcium, sodium and potassium in and out of the cells, effects have been shown at low current densities, thousands of times lower than currents induced by MW fields. ELF

8

fields have been shown to have the same effect. ELF fields have been shown to have the same effect. Reference is made to a scientific paper from, 1992 mentioning 10 different laboratories which have demonstrated these effects of calcium.

XV.

Dr. Cherry of Lincoln University, New Zealand concludes: There is extremely strong evidence that both ELF and ELF modulated RF/MW radiation causes calcium ion efflux from cells which significantly alter the intracellular calcium concentrations, reducing the efficacy of lymphocytes in the immune system, participating in the alteration of transformation of pineal serotonin to melatonin and altering the damaged cells likelihood of becoming neoplastic (cancerous) or dying by apoptosis.

XVI.

Radio Frequency Radiation: Effeet on Melatonin Production

Many scientific studies have linked cellular EMF-induced calcium-effects to the extremely important hormone melatonin which is produced in the pea-sized endocrine organ called the pineal gland, located near the center of the brain.

XVII.

Dr. Cherry writes "the calcium ion mediated responses to neurotransmitters on the membrane of the pineal cells have been discussed by Wilson et al. (1989) in relation to ELF induced melatonin reduction. Thus it is highly probable that pinealocytes exposed to modulated RF/MW will experience

9

an outflow of calcium ions, a reduction of the CAMP signal transduction activity and a reduction in the production of melatonin. This is a highly plausible mechanism to explain why RF/MW can reduce pineal melatonin production with consequent adverse health effects."

XVIII.

Melatonin is produced at night and released into the blood stream to be dispersed throughout the body. Once in the blood stream, melatonin has access to every cell in the body. It passes through the cell membranes where every nucleus has receptors for it.

XIX.

Melatonin is believed to have at least six fundamental physiological functions; mediating the whole-body 24 hour circadian rhythm; regulating sleep, mood and behavior like depression, anger and rage; scavenging free radicals (highly reactive cancer promoting agents); reduce secretion of tumor-promoting hormones; regulating gene expressions; protecting and stimulating the immune system.

XX.

Dr. Neil Cherry writes "Because of its action in removing free radicals, melatonin is probably the most efficient natural cell protection and oncostatic agent in our bodies. Every night, our pineal gland produces large quantities of melatonin which flood almost every cell in our body, cleaning out the free radicals and assisting cell division to take place with undamaged DNA. Since damaged

10

DNA can undergo mutation, it may result in the growth of a tumour.  As we age, our nocturnal peak melatonin production falls markedly, making elderly people much more prone to cancer.

XXI.

Numerous studies have shown that free radicals have an important role in the aging process. Aging has been ascribed to accumulated oxidative damage to body tissues and involvement of free radicals in neurodegenerative diseases, such as Alzheimer's, Huntington's and Parkinson's has also been suggested.

XXII.

Melatonin reduction in cells and animals has been found by several laboratories.  There is direct evidence of reduction in melatonin secretion in humans exposed to EMF, the effect varying from person to person, and that the timing of the exposures is also a factor.  In one of the latest reports on melatonin (1998), Dr. Burch et al. found reductions in the nocturnal secretion of a urinary melatonin metabolite among electric utility workers.

XXIII.

Consequence of Low Melatonin: DNA Breaks and Chromosome Damage

Dr. Lai and co-workers at University of Washington, Seattle have worked extensively on the induction of DNA damage in rat brain cells and tissue.  This research has shown that ELF as well as RF/MW exposures cause a significant increase in the amount of DNA breakage in rat brain cells. This research has been confirmed by other researchers.

11

## XXIV.

Dr. Lai writes: most cells have a considerable ability to repair DNA strand breaks; however, some cells only have a limited ability to handle this, such as brain and nerve cells which therefore could accumulate DNA breaks. Cumulative DNA breaks may affect cell function and may be the cause of slow onset diseases such as cancer. One of the popular hypothesis for cancer development is that DNA damaging agents induce mutations in DNA leading to expression of certain genes and suppression of other genes resulting in uncontrolled cell growth. Thus, damage to cellular DNA or lack of its repair could be an initial event in developing a tumor. However, when too much DNA damage is accumulated over time, the cell will die. Cumulative damage in DNA in cells also has been shown during aging. Particularly, cumulative DNA damage in nerve cells of the brain has been associated with neurodegenerative diseases, such as Alzheimer's, Huntington's and Parkinson's diseases.

## XXV.

Dr. Lai reported that the EMF induced DNA breaks could be blocked by treating the rats with melatonin.

## XXVI.

Dr. Cherry has summarized a number of studies associating EMT exposures with chromosomal damage. The Wireless Technology Research (WTR), an industry support research group, reported that cellular phone radiation can triple the number of chromosomal abnormalities

in human blood (Microwave News, March-April 1999). The chairman of WTR, Dr. George Carlo told Microwave News that "WTR had found links between cellular phone use and cancer."

### XXVII.

Neurological Effects

One of the most repeated effects of ELF modulated RF/MW is the calcium ion efflux from brain cells. This may lead to altered release and binding of neurohormones and neurotransmitters.

### XXVIII.

Dr. Adey (1981) reported "there is unequivocal experimental evidence that fields from ELF to UHF (lOHz to 450 MHz) interact directly with brain tissue." In 1991, Dr. Adey stated "RF fields that are sinusoidally amplitude modulated at ELF frequencies produce a wide range of biological interactions. Induced electric gradients can be substantially higher than those produced by simple ELF electric fields, and at levels of 10-100 mV/cm, are at the same range as intrinsic oscillations generated biologically, such as the electroencephalogram (EEG)."

### XXIX.

A recent summary of research relating to neurological effects of EMF exposure reports: changes in circadian rhythm (weber 1974); changes in evoked potential induced by MW exposure, decreasing latency and amplitude of reflex responses (Taylor and Sshleman 1975); significant and repeatable changes in the behavior of advanced mammals (cats and monkeys) induced by oscillating EMFs; changes in the dopamine (neurotransmitter) and opiate systems of the brain induced by EMFs

13

(Frey 1990); changes in the functioning of the endogenous opioids; EEG changes in animals have been shown in numerous studies on rabbits, rats, mice, etc.; EEG and sleep changes in humans exposed to GSM cell phone-like signals at a power density of 0.001 m W/cm$^2$ of or SAR of 0.001 W/Kg (von Klitziag 1995, Mann and Roschke 1996); learning and memory impairment; stress induction, stress hormone induction and reception; acetylcholine, corticotropin, benzodiazepine; Change in brain potential in humans induced by MW EMFs (Freude 1998).

### XXX.

The research team at the Catholic University of America (CUA) in Washington, DC., headed by Professor Theodore Litovitz has worked for more than a decade on the effects of EMF on the activity of the important enzyme omithine decarboxylase (QDC) in different cell lines, human and animal, and in chicken embryos. ODC is involved in DNA replication, i.e., cell growth. Increased ODC activity has for many years been used as a marker for cancer. ODC is very active in fetal development.

### XXXI.

The CUA team has consistently found EMF-induced change in the activity of ODC, and corresponding EMF-induced increase in the rate of fetal abnormalities in developing chicken embryos.

### XXXII.

14

Dr. Martin of University of Western Ontario, Canada, has found EMF -induced changes in the activity of another important enzyme, nucleotidase (5'-NT), *in* developing chicken embryos and hatched chickens.

### XXXIII.

On February 13, 1998, an international team of collaborating scientists representing five research institutions; Hughes Institute, St. Paul, Minnesota; University of Minnesota, Minneapolis; University of California, Riverside; Yale University, New Haven, Connecticut; and Kansai Medical University, Moriguehi, Japan, published the results of two new studies, funded by NIH, showing that 60 *H2* EMFs trigger a cascade of enzyme-driven cell-signaling events that could result in cancer. The EMFs activated a tyrosine kinase enzyme dangling from the inner surface of the cell membrane, The EMFs triggered also a second tyrosine kinase known as BTK. Studies in people have shown that excessive activation of BTK can lead to leukemia, lymphomas and other cancers.

### XXXIV.

Cell Stress and Gene Transcription

In 1987, Dr. Henry Lai, University of Washington, Seattle, speculated that biological responses are in effect stress responses, i.e., EMF is a stressor. Dr. Lai and his team carried out a series of experiments to compare the effects of MW EMF on acetylcholine with those of two known stressors; loud noise and body restraint.

### XXXV.

15

The studies showed that the responses are very similar. The two other pieces of information also supported the notion that EMF is a stressor. It turned out that EMF activates the stress hormone corticotropin releasing factor, and affect benzodiazepine receptors in the brain. Benzodiazepine receptors mediate the action of antianxiety drugs, such *as* valium and librium, and are known to change when an animal is stressed.

### XXXVI.

Dr. Reba Goodman of Columbia University, New York, has studied altered patterns of biosynthesis induced by EMFs. Dr. Goodman and her team (1989) observed the synthesis of low molecular weight proteins called heat shock or stress proteins following exposure to EMFs. These stress proteins are also formed as a result of other stressors such as heat shock, ionizing radiation, infections, chemical toxins, etc.

### XXXVII.

In later studies Dr. Goodman showed that EMFs alter the expression and transcription of genes responsible for the onset of stress protein production. Dr. Goodman's work has been confirmed later by other scientists (O. Smith 1996).

### XXXVIII.

In 1998 a team of scientists at the Department of Life Sciences, University of Nottingham, UK, published a study showing that transgenic nematodes, used to monitor toxic contaminants in water and soil, react to MW ENE as a stressor, thus confirming the results of Dr. Goodman.

16

## XXXIX.

Dr. Goodman has published other reports of studies showing that EMFs alter the transcription of proto-oncogenes (c-myc and others), which gene factors are believed to be associated with. the onset of cancer.

## XL.

On information and belief the defendants made knowing misrepresentations and engaged in a conspiracy to deprive the public of information and, in so doing, provided a product without necessary safety features in the forms of headsets to isolate and insulate the user from RFR, which RFR and its impact are non-apparent upon inspection of the WHHP. The misrepresentation and conspiracy is evidenced, but is by no means limited to the following events:

## XLI.

The Defendants knew or should have known that the use of RFR frequency in WHHPs was hazardous and also that it was foreseeable that WHHPs created some health risk and would or could cause some adverse health effect.

## XLII.

The Defendants' researchers and engineers have known at all times relevant that RFR energy is absorbed and/or penetrates deeply into biological tissue such as the human head and brain, and that RFR can have a serious biological impact on the WHHP user. The Defendants failed to inform their

17

customers and the general public through warnings, mailings, advertisements, or any other means, that RFR can cause undesired biological changes, harm and/or create health risks.

## XLIII.

Plaintiffs, customers of the Defendants, and the general public were and continue to be misled and deceived by the Defendants into believing that these WHHPs operate at power levels too low to cause adverse health effects and/or are, in the absence of headsets, completely safe for public use.

## XLIV.

Defendants were in control of the design, assembly, manufacture, packaging, marketing and/or sales of WHHPs and related services, which have been widely advertised by the Defendants as safe.

## XLV.

In late 1994, researchers reported on their observation that rats exposed to microwaves similar in intensity to those radiating from a WHHPs antenna appeared to experience single strand DNA breakage as a result of the exposure. The following year, reports were published suggesting double strand DNA breaks in the same exposure scenario. Researchers had adapted the traditionally *in vitro* single cell gel assay in an *in vivo* situation. From this, Defendants knew or should have known that WHHPs had the capability to cause biological damage.

## XLVI.

18

In 1997, researchers were reporting biological effects in rats exposed head first to WHHP

mediated RFR.  These studies represented controlled studies showing biological effects from RFR

exposure that were not heat induced.

XLVII.

Defendants who are members of what was formerly known as the Cellular

Telecommunications Industry Association, (CTIA), but now known as the Cellular

Telecommunication and Internet Association and/or the Telecommunications Industry Association

(TIA) have, through the use of and with the CTIA, and/or (TIA) knowingly, negligently and

otherwise wrongfully continued to maintain as an industry that WHHPs are safe in the absence of

headsets even though the studies proved  that such representations were unwarranted.

XLVIII.

The Plaintiffs allege that the Defendants intentionally, negligently and wrongfully reported

that the WHHPs were safe and that there was no danger and/or risk of danger from levels of RFR

emitted from WHHPs.

XLIX.

Even though Defendants were aware of the increasing demand for WHHPs and wireless

service, on information and relief and as suggested by events described herein, they, individually

and/or through industry organization, failed to conduct adequate testing, manipulated the results of

19

other testing, concealed evidence that WHHP radiation is harmful, and suppressed scientific and medical research.

### L.

The Defendants were aware of the results of numerous studies outlining the biological risks associated with WHHPs. Nevertheless, the Defendants failed to apprize claimants, their other customers, and the public that WHHPs pose biological risks.

### LI.

Research conducted and paid for directly by one or more of the Defendants has repeatedly shown that the Defendants have and continue to manipulate science to the detriment of consumers by failing to reveal all relevant findings and by selectively withholding important public health information from the public and claimants.

### LII.

The Defendants have actively encouraged the increased use of WHHPs, while knowing the biological risks associated with their use.

### LIII.

The product warnings in effect during the period relevant to this Complaint were both substantively and graphically wholly inadequate to alert claimants and other consumers of the risks and/or potential risks associated with WHHP use in the absence of a headset.

### LIV.

20

As a result, the public has been grossly misled and misinformed regarding the biological risks and effects and/or potential biological risks associated with WHHP usage in the absence of a headset.

LV.

At all times relevant, Defendants, themselves, or by use of others, did manufacture, create, design, test, label, package, distribute, supply, market, sell, advertise, and/or otherwise distribute WHHPs, products, and services related to WHHPs through the United States, as well as to WHHP owners and users throughout its service areas and, as to some Defendants, internationally.

LVI.

Defendants' strategy has been to aggressively market and sell these products and the related services while, at the same time, misleading and misinforming potential users about the products and by failing to protect users from health risks, effects, and dangers which Defendants knew or should have known could result from use of WHHPs without a headset.

LVII.

Defendants undertook an advertising blitz extolling the virtues of WHHPs in order to induce widespread use of the product. The Defendants marketing campaign consisted of advertisements on television, radio, and the Internet, promotional literature to be placed in the printed media and in other advertising media, and other promotional materials to be provided to potential users of WHHPs.

LVIII.

21

Defendants purposefully downplayed, understated, and/or did not state the health hazards, effects, and/or the potential health risks associated with WHHPs. Defendants, through promotional literature, deceived potential users of WHHPs by relaying positive information, including testimonials from satisfied users, and by manipulating statistics to suggest widespread acceptability, while downplaying, understating, and/or misstating the known and/or potential adverse and serious health effects. Defendants kept relevant information from potential and actual WHHP users and minimized user concern regarding the safety of these products and services.

LIX.

In the materials produced and disseminated by Defendants, they misrepresented a number of facts regarding WHHPs, including the following:

a.    The presence of adequate testing of RFR and potential biological effects on WHHP users.

b.    The adverse health effects that may be caused by WHHPs.

LX.

During World War II intensive research and engineering work led to the development of devices capable of producing electromagnetic energy at the radio frequency band.

LXI.

Defendants were aware or should have been aware of numerous studies and experiments that demonstrated the health hazards of radiation from RFR dating back to the 1940s.

22

LXII.

The medical and scientific communities were well aware of the biological effects of RFR in the 1920's. In 1928, Helen Hosner, a researcher at the Albany Medical College, showed that radio waves were capable of heating body tissue in a study investigating the effects of experimental short wave radio transmitters on workers at a General Electric research facility. Her work was entitled "Heating Effects Observed in a High Frequency Static Field" published in Science.

LXIII.

In a 1948 article published in the archives of Physical Medicine, it was reported that electromagnetic radiation at 2,450 MHz was "highly productive in producing lenticular opacities."

LXIV.

In 1952 researchers noted that "experiments in which the head area alone was directly irradiated suggests that the fatal outcome was the result of an excessive rise in brain temperature. The lethal effects of irradiation to a limited area of the body are different from those in which the entire animal is exposed.." That warning was published after researchers had exposed laboratory rats to a few seconds of intense exposure of radio frequency radiation. The warning was published in Microwave Radiation; Biophysical Considerations and Standards Criteria, IEEE Transactions on Biomedical Engineering.

LXV.

23

In 1955, researchers Schwan and Piersol published their work that radio frequency energy, in a broad range from 500 MHz to 1000 MHz is preferentially deposited beyond the skull and absorbed into the brain.

## LXVI.

In its initial form, during the 1960's the IEEE/ANSI safety standard, known as ANSIC95.1. established a maximum safe exposure level for radio frequency radiation at 10.0mW/cm2.  The modified standard.  ANSIC95.1-1982 set the maximum level for radio frequency exposure on a sliding scale by dividing the frequency by a multiple of three hundred.  At 845 MHz, the safety standard would be 2.8 mW/cm2; at 1900 MHz, the safety standard would be 6.33 mW/cm2.

## LXVII.

In 1962, it was known in the scientific community that radio frequency energy is most efficiently absorbed into human tissue and is capable of producing undesirable effects.

## LXVIII.

It was well known in the scientific and medical communities in the 1970s that an antenna is the most efficient means of depositing energy into the human body and penetrating human tissue.

## LXIX.

In 1971, A.W. Guy published in IEEE Transaction in Microwave Theory and Techniques that in order to obtain selective heating. "hot spot" heating, it is necessary to expose the tissue to the near zone fields of the energy source, namely the antenna. From this experimental data at 433 MHz,

750MHz, and 918 MHz the research confirmed that energy is readily absorbed from the induction fields in the near zone. The absorption within the brain was found to be about 20 times greater than that of the skull and subcutaneous fat.

## LXX.

In 1972, in a study by I. J. Bahl, it was demonstrated that frequencies between 700 megahertz and 1000 megahertz interact most efficiently with human tissue to yield the greatest energy absorption and that the temporal lobe of the brain is the most sensitive area of the body to this type of radiation. The work performed by Bahl was published in IEEE Transactions on Microwave Theory and Techniques, a publication accepted as authoritative in the medical and scientific communities.

## LXXI.

In 1977, L.C. Lin published the results of his research in IEEE Transaction on Microwave Theory and Techniques. Results revealed that because microwave absorption occurs in a very short time there is little chance for heat conduction to take place; the conduction of heat takes much longer. At "'hot spots" the inability of biological tissue to get rid of excess heat quickly and efficiently may be yet another mechanism leading to destructive exposure.

## LXXII.

Research confirmed that "hot spot" absorption is dependent on the diameter of the head model which was used. As the diameter decreased the absorption effect became more pronounced.

25

Most notably. The greatest absorption enhancement occurs at frequencies between 800 MHz to 1000 MHz, effectively covering the portable cellular telephone transmit band.

### LXXIII.

In 1977, O.P. Gandhi published a study in Radio Science which confirmed that radiation absorption enhancement occurs when subjects are close to reflecting surfaces. Gandhi reported a measured energy absorption enhancement factor of as much as 27 in close proximity to corner shaped reflectors and about 4.7 for flat reflectors.

### LXXIV.

In 1978, MOTOROLA studied the efficiency of the antenna and learned that the maximum Specific Absorption Rate exists at the antenna "feed point."

### LXXV.

Long before the introduction of cellular telephones, researchers provided data indicating that children absorb approximately 50% more radiation within their heads than do adults. The research performed by C.H. Durney, reported in IEEE Transactions on Microwave Theory and Techniques in 1979, only took into consideration the plain wave, far field exposures and did not include any of the enhancement effects that are introduced by the near zone operation of cellular telephones.

### LXXVI.

In 1979, researchers Sheppard, Bawin and Adey confirmed in a published article that low intensity modulated (16 Hz) 450 MHZ fields produced modified calcium efflux through brain cell

26

membranes. The researchers observed the effect for power density levels lower than 2.0 mW/cm2. The work was published in Radio Science in December 1979.

### LXXVII.

In 1979, in an experiment by J. L. Meyerhoff, laboratory rats were killed quickly to prevent unwanted changes in brain structure. It was reported that "it is preferable to focus the microwave energy into the head of the animal, thereby increasing the efficiency of the energy delivered to the brain." The experiment was published in IEEE Transactions on Microwave Theory and Techniques in January, 1980.

### LXXVIII.

The cellular phone industry conducted extensive research in the early 1980s on the effects of antennas and discovered that there is a large amount of stored energy that is disposed immediately around the antenna of a cell phone.

### LXXIX.

In follow up research, Adey published in 1980 research demonstrating modifications in brain cells at low level radiation exposure. Adey also reported that weak modulated frequency radiation results in major physiological changes. The work was published in Proceedings of the IEEE, January 1980.

### LXXX.

27

In 1981, a MOTOROLA researcher was quoted in IEEE Transactions on Vehicular Technology (November) "the proposed standard recognizes the possibility of encountering fields higher than the maxima of the protection guides in the close vicinity of low power radiators, like portable communication equipment. For this reason, an exclusion clause for devices operating at 1 GHz or less and with less than 7 watts output power has been proposed."

### LXXXI.

At the same time, MOTOROLA researchers publically stated, "the Radio Frequency Protection Guides of the American National Standards Institute at 750 MHz would be violated at 0.3 centimeters distance by a resident dipole radiating about 1mW and at .5 centimeters distance by a radiated power of 4mw." "A resident dipole provides the most favorable condition of minimum stored energy around the antenna." The researchers conceded that, ''a rigorous enforcement without exclusion of the radio frequency protection guides would render portable radios practically useless."

### LXXXII.

MOTOROLA researchers concealed from the public the enhancement effects of antennas and the efficiency that antennas deposit energy into brain tissue. In an article published in 1981 in IEEE Transactions on Vehicular Technology, a prominent MOTOROLA employee stated, "this paper addresses the question of how long the power radiated by a dipole has to be so that the field near the antenna never exceeds the ANSI - Proposed Protection Guides for distances greater than .3 centimeters, which is the spacing which at times separates the antenna from the head of the portable

28

radio user. Radiated power of a few milliwatts is enough to exceed the proposed radiation protection

guides at 750 MHz. Such reticence in accepting the clause probably resides in the fact that the near

field of antennas is largely uninvestigated." At the same time, a prominent Motorola researcher

stated, "the study of the near field has been substantially neglected." The same prominent

MOTOROLA researcher stated, "dipole antennas, although extensively used in portable and mobile

communications, have not been carefully investigated in the near field."

### LXXXIII.

In 1981, during the time that the exclusion of portable cellular phones was debated within

the ANSI Committee, a MOTOROLA-researcher was quoted as stating, "strict enforcement ...

technically forbids the exposure to a resident dipole about 19 centimeters long, radiating 1 Mw."

### LXXXIV.

In 1982, MOTOROLA researchers found that as little as 250 micro watts radiated power

would be enough to exceed the safety standards established by the American National Standards

Institute when using the helix antenna as the radiator for near zone exposure. The study was

published in IEEE Transactions on Vehicular Technology in November, 1982.

### LXXXV.

The MOTOROLA researchers found that the exposure to the helical antennas yields a power

density of as much as 127 mW/cm2 when the antenna is placed about 1 centimeter distant. The

radiated power was only .02 Watts, which is thirty times less than what is radiated from a portable cellular phone.

### LXXXVI.

MOTOROLA'S deceptive misrepresentations led customers and the public into believing that there were health care standards in place, when in fact MOTOROLA knew the following: (1) that human body absorbs non-ionizing electromagnetic energy; (2) that more radiation is absorbed by the users' hand and head than is transmitted into space; and (3) that the absorbed radiation by the users hand and head exceeded acceptable safe standards.

### LXXXVII.

The Defendants knew since the 1970's that this type of radiation is absorbed by the human body and not reflected away. Overwhelming research by notable scientists has indicated that more than 50% of the radiated energy from cell phones is absorbed within the head and brain.

### LXXXVIII.

In 1984, in an article published by Microwave News, there was a report of a 1984 study by the United States Air Force in which it was found by Dr. Vernot of the University of California "findings of excess malignancies in the exposed animals is provocative" after being exposed to radio frequency radiation.

### LXXXIX.

In 1986, the United States Air Force sponsored a study performed by A.W. Guy in which 100 rats were irradiated over a three year period and compared to 100 rats that were not exposed to radiation but were otherwise treated identically. After the experiments were completed the researchers reported that 18 malignant tumors developed in the exposed rats as compared to 5 in the control group rats. The researchers claimed that such a difference was "statistically highly significant." They also stated, "at face value this last finding suggests that low levels of microwave radiation can cause cancer in mice." Remarkably, the Environmental Protection Agency accepted a report by the same researchers who suddenly "corrected" their conclusions. The EPA in 1986 stated that evidence of carcinogenicity must be confirmed to a specific tumor type.

XC.

In 1989, Stephen Cleary presented a review of the state of research related to non-thermal interactions and effects of radio frequency radiation. He concluded, "cellular studies provide convincing evidence that RF radiation, and other types of electric or magnetic fields, can alter living systems via direct non-thermal mechanisms, as well as via heating."

XCI.

During a 1989 meeting of the ANSI Committee, held in Tucson, Arizona, industry representatives dominated the membership of the standard setting committee. After a heated discussion and debate over the exclusion clause it was decided upon a vote by the committee that portable cellular telephones would not be excluded from regulation or compliance under the ANSI

31

Safety Standard. A short time after the meeting, at another quietly held committee meeting attended by a select, smaller group of members, the exclusion clause passed, and as a result, cell phones would be excluded from any testing, compliance, or monitoring by any safety standard, government agency, or regulatory body.

### XCII.

The American National Standards Institute 'ANSI' has adopted a set of electromagnetic energy exposure levels that the Institute of Electrical and Electronic Engineers (IEEE) has determined to be safe for humans. The ANSI safety standard was initially developed during the 1960's modified during the early 1980's, and modified again, most recently, during the early 1990's.

### XCIII.

The cellular phone industry manipulated the research and pressured members of the Safety Standard Committee to exempt portable cellular telephones from regulation and compliance under the ANSI standards. Cellular telephones, then and now, would not meet the ANSI standard established in 1982.

### XCIV.

In 1992, a project performed by A. Macs confirmed a marked increase in the frequency of chromosomal aberrations and the presence of micro nuclei in peripheral blood after exposed to 2,450 MHz radiation.

### XCV.

32

In 1992, F. Montecchia published an article in IEEE Transactions on Biomedical Engineering that some antennas are specifically designed to use the non radiating induction energy (around the antenna) for penetration into humans. One such antenna was specifically developed to provide an improved method for depositing energy into tissue for hyperthermia treatment.

## XCVI.

In 1992, it was reported in Microwave News, a news publication widely circulated and read by the scientific and medical community, that Keith Angstadt, an antenna technician, was treated at Johns Hopkins University for exposure to radio frequency radiation which led to his loss of night vision and color blindness. The retinas of his eyes had sustained 5 mW/cm2 of continuous wave radiation.

## XCVII.

The medical and scientific communities were well aware of the extensive research published and reported throughout the 1950's and 1960's of the dangers of causing burns when RFR is applied over a bony prominence. It was revealed that non-uniformities such as bone ridges and irregular fat layers caused the energy to be absorbed non-uniformly within the body or head.

## XCVIII.

On January 26, 1993, MOTOROLA, through one of its senior executives announced to the news media, and subsequently reported by the news media to the public, that "thousands of studies"

33

had already shown cellular phones were safe.  Such statement was fraudulent, deceitful, and misleading.

XCIX.

On July 16, 1993, the Cellular Telecommunications Industry Association (CTIA) representing many of the named Defendants, issued a report entitled "Safety Update-Fast Facts: Portable Cell Phone Safety" in which it was deceptively stated, in bold print, the following: "Rest assured; cellular telephones are safe!"

C.

On July 19, 1993, Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health, Food and Drug Administration, sent a correspondence to CTIA president Thomas Wheeler, which clearly identified certain deceitful statements made by the Defendants to the public regarding the "safety" of WHHPs. In pertinent part, this letter states:

> I am writing to let you know that we were concerned about two Important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.
>
> First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all.  (Some readers might also wonder how impartial the research can be when its stated goal is 'a determination to reassure consumers,' and when the research Sponsors

34

> predict in advance that 'we expect the new research to reach the same
> conclusion, that the cellular phones are safe.'
>
> We are even more concerned that your press statements did not
> accurately characterize the relationship between CTIA and the
> FDA.... [S]ince it is not yet clear whether we will help to direct the
> research program, it is premature to state that we will credential the
> research.

To sum up, Mr. Wheeler, our role as a public health agency is to protect health and safety, not to

"reassure consumers". I think it is very important that the public understand where we stand in

evaluating the possibility that cellular phones might pose a health risk....

CI.

In 1993 N. Kuster published an article in IEEE Transactions on Biomedical Engineering

which demonstrated the very high level of energy absorbed into the head and brain in the area close

to the location of the antenna. Kuster reported that the maximum SAR measured in models of

human heads exposed to 1 Watt of energy was 5 mW/g. The antenna employed was approximately

one inch from the head of the model.

CII.

In December 1993 Chegrinets reported that pulsed 150 to 300 MHz at 5 mW/cm2 caused

chromosomal changes in human peripheral lymphocytes and whole blood cells.

CIII.

In or about late 1993/early 1994, the cell phone industry, including certain of the named

Defendants, through CTIA, organized a committee which was to draft a manual to discuss

35

"responsible" WHHP use. After receiving a draft of the manual, Thomas Wheeler, president of

CTIA, sent out a memorandum expressing his concerns over certain language used in the manual

which acknowledged and/or implied that the use of WHHPs could pose health risks. An example

of such substantive changes follows, with the suggested deletions put forth in bold typeface:

> Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna. **Otherwise you may impair call quality, may well cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard.**
>
> **If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain a distances from the antenna of more than 4 inches (10 centimeters).**
>
> For best call quality, keep the antenna free from obstructions and point it straight up."

CIV.

Gandhi, a well known and respected researcher, published findings of his research that were

contradictory to Kusters, Gandhi reported that the maximum SARs within the human brain would

be about 30 times lower than what Kuster had reported. But by March of 1994. the word in the

research community bad spread that the Gandhi team had, in fact, misstated SAR figures. During

the 1994 Bioelectromagnetics Society 16th Annual Conference, Gandhi produced findings of still

higher maximum SARs for the same research. During his presentation, SARs corresponded, at

times, to levels as much as ten times higher than were previously reported. The conference results,

presented in Copenhagen, Denmark, never reached the U.S. audience. In a letter to the Federal

36

Communications Commission, August 1994, Gandhi explained the nature of the errors and revised his experimental results upward. That is, nearly a full year after the initial false claims of safety - and almost six months after his revisions first became known, the Gandhi team provided an official correction.

CV.

In 1994 research performed in India by Sarkar, et al. confirmed that DNA modifications result from low-level exposure to radio frequency radiation. Clearly, if radio frequency radiation can rearrange the DNA in tissue then it can initiate cancer.

CVI.

In 1994, Henry Kues, a Johns Hopkins researcher, reported cell destruction and cell death comparable to that which would be expected from ultraviolet radiation was reported from exposure of rhesus monkeys to 1,250, *2,450* and 2,850 MHz radio frequency radiation. In a 1980 addition of IEEE Proceedings, it was reported that radio frequency radiation may inactivate enzymes or proteins that are involved in the repair process to correct DNA breaks and may also be responsible for inhibiting inherent DNA repair processes. In 1984, two researchers, Dr. Chang and Dr. Milham, made a presentation to the Annual Bioclectromagnetics Society Conference in which they revealed an increase in malignant tumors in rats after long term exposure to radio frequency radiation in experiments they conducted.

CVII.

37

In 1994, L. Verschaeve documented evidence that human and rat blood samples exposed to 450 and 954 MHz radiation provided induced DNA breaks. The cellular phone industry has insisted for fifteen years that no such effect could be obtained from radio frequency radiation. The research by Verschaeve is but one of many similar reports that became known during 1994 and which supports the earlier findings of Cleary.

## CVIII.

C.D. Cain disclosed in 1994 that 837 MHz radiation at a power density exposure level of 3.7 mW/cm2 produced a 40% increase in what researchers refer to as "focus Formation." These researchers explained at the 16th annual Bioelectromagnetics Society that the radio frequency radiation was acting as a co promoter for cancer formation.

## CIX.

The Defendants knew, on or about June 12, 1994, that the notable researcher Henry Lai, (and others) presented a report that indicated low-level (0.6 mW/g SAR) radio frequency radiation exposure at 2450 MHz resulted in memory deficits for experiments conducted with rats. This was a follow-up presentation of an article by Lai, Horita & Guy published only a few months earlier that provided substantially the same information. The memory deficits were observed as an inability of the rats to perform in a maze experiment. In effect, the rats forgot their way around a familiar area. The researchers explain the effect as being caused by a decrease in brain activity. The low-level radiation exposure is extremely significant. Virtually all operators of cell phones subject themselves

38

to such exposure and energy absorption while operating the phone. Further, the memory deficits do not stop when the exposure ends. Researchers have learned that the effect persists for five days or more.

CX.

Late in 1994 Lai and Singh made known the results of their research which should have been received as conclusive proof that cellular phone radiation is capable of causing harmful biological effects. The researchers reported in the International Journal of Radiation Biology that low level exposure to radio frequency radiation causes an increase in single and double strand breaks in DNA.

CXI.

Lai and Singh repeated their earlier experiment with similar results in 1996. In 1997, Repacholi published the results of his work that demonstrated that mice exposed to low levels of 900 MHz radiation exhibited a higher incidence of cancers than did their non exposed laboratory counterparts.

CXII.

Certain Defendant(s) acted in a wrongful, deceitful, intimidating, illegal, and harassing manner to a researcher by the name of Dr. Jerry L. Phillips, who essentially replicated the DNA damage studies of Lai and Singh and reached the same conclusions, i.e., exposure to low levels of radio frequency radiation causes DNA damage which can develop into cancer.

CXIII.

39

MOTOROLA willfully and wantonly attempted to suppress information from its customers, the public, and government regulatory agencies through improper pressure and intimidation upon Dr. Phillips.

CXIV.

After completion of his research, Dr. Phillips expressed his desire to publish said research. Initially, MOTOROLA told Dr. Phillips that it was too early to publish his results and that he needed to do more research. When Dr. Phillips refused to "spin" his research, as demanded by MOTOROLA, MOTOROLA cut off Dr. Phillips' funding. Additionally, MOTOROLA threatened to discredit Dr. Phillips in the scientific community, as well as to ruin his career.

CXV.

Dr. George Carlo is a notable public health scientist, epidemiologist, lawyer, founder of Health Risk Management Group, and the individual appointed by the cell phone industry to study the health hazards associated with WHHP use. After leading the research effort regarding the health hazards associated with WHHP use for a period of six years, Dr. Carlo indicated that WHHPs may very well pose health risks to its user. In a response similar to that received by Dr. Phillips, the cell phone industry cut off Dr. Carlo's funding, attempted to discredit him with the scientific community, and attempted to ruin his career.

CXVI.

40

Motorola and all Defendants, in prior litigation and in this litigation, asserted to the Court

that the Food and Drug Administration (the FDA) had taken action which preempted the claim

brought herein. Defendants knew or were aware of sufficient facts that they should have known that

the FDA had taken no such actions and that, indeed, due to cuts in funding and personnel the FDA

cannot adequately do its job under the law.

### CXVII.

By amending paragraph 7 of the original Petition to read as follows:

### 7.

> Prior to the filing of the original Petition and this First Supplemental
> and Amending Petition, at least one named plaintiff purchased one or
> more WHHPs manufactured and/or distributed by one or more of the
> named defendants and at least one of the named plaintiffs after
> learning of the existence of the hidden non-apparent danger of
> invisible emissions from WHHPs purchased a headset specifically to
> protect from and avoid exposure to harmful radio frequency radiation
> (RFR) in the absence of the use of the headset.

### CXVIII.

By amending paragraph 8 of the original Petition to read as follows:

### 8.

> Due to the inherent design of the WHHPs, WHHPs contain hidden
> vices or defects in that they emit unseen RFR which enters the users'
> brain through the location of the antenna proximate to the users'
> bones, skull, head and brain exposing plaintiffs and all users to risk
> of damage, injury to their health and well-being and unexpected
> changes in their physiology, all of which is due to the proximity of the
> antenna. The risk of changes and dangers arise from the fact that the
> WHHP receives various transmission which, through the antenna,

41

direct the RFR directly into the user's body. The demonstrated risks include cellular damage and other adverse effects, including those identified in paragraph LXXXII.

CXIX.

By amending paragraph 9 of the original Petition to read as follows:

9.

On information and belief it is alleged that all of the manufacturers and distributors and the CTIA and the Telecommunication Industry Association (TIA) knew, know, and have long known and/or should have known of the scientific information which indicates and establishes that plaintiff and other WHHP users are exposed to RFR which causes physical effects, changes and the risk of long term injury including the potential for very significant long term health problems. It is also alleged, on information and belief, that each and/or several of the defendants herein acting through the CTIA and/or TIA were privy to, aware of and affirmatively discussed, but withheld and failed to properly convey to the public, each of those concerns and realities.

CXX.

By amending paragraph 10 of the original Petition to read as follows:

10.

At all times the manufacturers and distributors knew or should have known of the feasible and economically reasonable method to insulate users from the undesired exposure to RFR and the physical effects and significant health risks arising therefrom, but, on information and belief, for economic and other reasons reflecting self-motivation, the manufacturers failed to incorporate the economically feasible, reasonable and safer headset design as a standard feature in their WHHPs, thus unnecessarily continuing to expose users to the

42

non -apparent assault on their head, skull and brain and due to the exposure to RFR through the antenna.

CXXI.

By amending paragraph 11 of the original Petition to read as follows:

11.

The cure to the recognized problem caused by the non-apparent vice or defect is a headset which attaches to or is made part of the phone to allow the operator to use the WHHP in such a fashion that the dangerous levels of RFR entering the human body  through the proximity of the cell phone to the head, skull and brain are maintained at a distance from the head.

CXXII.

By amending paragraph 12 of the original Petition to read as follows:

12.

The headset was feasible and economical at the time of manufacture and distribution of the phone, but were not incorporated as a standard feature of the WHHPs.

CXXIII.

By amending paragraph 13 of the original Petition to read as follows:

13.

Plaintiff, and others similarly situated, purchased WHHPs believing they were obtaining a safe product at an agreed upon price.  The WHHPs were and are normally sold by the distributor defendants including Radiofone and  Bell South Mobility/Cingular  at a deep discount in order to attract purchasers to purchase long term calling plans and services.

43

CXXIV.

By amending paragraph 14 of the original Petition to read as follows:

14.

In order to make their WHHPs safe, and to avoid the impact of the defect due to the non-apparent RFR and the manner in which it enters the head, skull or brain when the WHHP is in use plaintiffs would be required to purchase, as a separate or after market accessory, a headset.

CXXV.

By deleting paragraph 15 of the original Petition.

CXXVI.

By amending paragraph 16 of the original Petition to read as follows:

16.

Plaintiffs understood that when they purchased their WHHPs and obtained the related services that the necessary and complete costs for a safe phone had been identified, recognized, and made available to them in connection with their purchase of the WHHPs and the services.

CXXVII.

By deleting paragraph 17 of the original Petition.

CXXVIII.

By amending paragraph 18 of the original Petition to read as follows:

18.

The failure to incorporate or furnish an appropriate headset into the WHHPs resulted in a breach of warranty, breach of contract, and/or

44

redhibitory defect, such that plaintiffs are entitled to have the WHHPs made safe by the manufacturers and distributors through the furnishing of a headset and/or to obtain a reduction in the price to the extent necessary to allow owners, users and lessees to purchase or receive a headset or a WHHP with a compatible headset in order to render the WHHPs safe and to avoid the risk of and/or unwanted alterations of physiology and health effects.

### CXXIX.

By amending paragraph 19 of the original Petition to read as follows:

### 19.

a)    The failure to include a headset as needed to protect against RFR and its effects constitutes a negligent or intentional misrepresentation or the breach of contract for sale and/or lease and/or breach of implied and express warranty for fitness for its intended purpose and is a separate violation of 15 U.S.C. 2301, et seq. including 15 U.S.C. 2310 and/or is a redhibitory vice or defect.

### CXXX.

(A)    The Defendants have violated various provisions of the Magnuson-Moss Warranty Improvement Act, 15 U.S.C. 230 *et seq.*, in that the implied warranty of fitness for a particular purpose has been breached by the Defendants in failing to provide a headset at the time of a cellular telephone.

(B)    The Defendants have been given the opportunity to remedy the defect of the product by providing a headset to purchasers, but the Defendants have failed to cure the defect.

(C)     Moreover, the Defendants, through their spokespersons, have repeated declared expressly that cellular telephones "are safe." This statement by Defendants' representatives amounts to an unauthorized express warranty of fitness for an intended purpose.

(D)     There is ample evidence that the use of cellular telephones over time may be unsafe and at a minimum poses a risk of harm that warrants due consideration by Court and makes the express warranty of the manufacturer Defendants misleading and/or deceptive.

(E)     As such, the Defendants have engaged in deceptive trade practices in violation of federal law. 15 U.S.C. 45, *et seq.* as incorporated by 15 USC 2310 (b).

(F)     Remedies available under these provisions of federal law are warranted, and should be given to class claimants under 15 U.S.C. 2310, *et. seq.*

(G)     The claimants seek class certification under the provisions of the Magnuson-Moss Warranty Improvement Act.

CXXXI.

By amending paragraph 22 of the original Petition to read as follows:

22.

Based on the foregoing, plaintiffs, and all persons similarly situated, are entitled to the following specific relief and all other relief available as a matter of law:

46

1.    An appropriate headset compatible with their WHHP and/or funds, and/or a coupon for an appropriate headset compatible with their WHHP, or a reduction in price sufficient to obtain a headset.   If there is no appropriate compatible headset for a WHHP, a WHHP with an appropriate headset.

2.    With respect to all individuals who have already purchased such headsets, a reduction in the purchase price necessary to create reimbursement of the amount so paid;

3.    Attorneys' fee plus all interest allowed as a matter of law.

## CXXXII.

By deleting all claims under the Louisiana Unfair Trade Practices Laws, all claims for medical monitoring, all claims for emotional distress, pain and suffering, and by deleting all claims for any individualized physical injury.

## CXXXIII.

By restating paragraph 23 of the original Petition to request a jury on all counts and all claims set forth herein.

WHEREFORE, plaintiffs pray that this First Supplemental and Amending Complaint be filed, and that each of the defendants be served and cited with same, and that after all proceedings are had there be judgment allowing this matter to proceed as a class action against defendants for all plaintiffs and class members in such amounts as are just, and as requested in the body of this Complaint including, but not limited to an appropriate headset or WHHP with compatible headset

47

and/or coupon necessary to obtain a headset as may be necessary, reimbursement of amount paid for

headsets, attorneys' fees and legal interest.

RESPECTFULLY SUBMITTED:

**LOWE, STEIN, HOFFMAN, ALLWEISS
& HAUVER, L.L.P.**

By: _____

MICHAEL R. ALLWEISS (#2425)
    701 Poydras Street
    One Shell Square, Suite 3600
    New Orleans, LA  70139
    Telephone: (504) 581-2450
        Attorneys for Plaintiffs

**ST. MARTIN & WILLIAMS**
CONRAD S.P. WILLIAMS, III (# 14499)
    4084 Hwy. 311
    P. O. Box 2017
    Houma, LA  70361-2017
    Telephone: (504) 876-3891
        Attorneys for Plaintiffs


**LAW OFFICES OF PETER G. ANGELOS**
H. RUSSELL SMOUSE
JOHN A. PICA, JR.
    100 N. Charles Street
    One Charles Center, 19th Floor
    Baltimore, MD 21201
    phone 410-649-2000
        Attorneys for Plaintiff

48

**HOWELL & GATELY**
WILLIAM F. GATELY
100 N. Charles Street
One Charles Center
Baltimore, MD 21201
phone 410-649-2000
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing pleading has been served on all counsel of record to this proceeding by hand delivery, by electronic mail, by telephonic facsimile transmissions, Federal Express, or by placing copy in the United States Mail, certified return receipt requested or first class postage prepaid and properly addressed on this ⅃Ꮞ day of April, 2001.

MICHAEL R. ALLWEISS

49